## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MARNEU HOLDINGS, CO., 111 JOHN REALTY CORP., UNITED EQUITIES COMMODITIES COMPANY, on behalf of themselves and all others similarly situated, and derivatively on behalf of the FEDERAL NATIONAL MORTGAGE ASSOCIATION and FEDERAL HOME LOAN MORTGAGE CORPORATION, 160 BROADWAY – 1ST FLOOR, NEW YORK, NY 10011<br><br>        Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, in its capacity as Conservator of the Federal National Mortgage Association and Federal Home Loan Mortgage Corporation, 400 7TH STREET, S.W., WASHINGTON, D.C. 20024;<br><br>THE UNITED STATES DEPARTMENT OF THE TREASURY, 1500 PENNSYLVANIA AVENUE, N.W., WASHINGTON, D.C. 20220;<br><br>        Defendants,<br>and,<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, 3900 WISCONSIN AVENUE, N.W., WASHINGTON, D.C. 20016;<br><br>FEDERAL HOME LOAN MORTGAGE CORPORATION, 8200 JONES BRANCH DRIVE, MCLEAN VA 22102,<br><br>        Defendants,<br>        and Nominal<br>        Defendants. | **CLASS ACTION AND DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

## TABLE OF CONTENTS

**Page(s)**

NATURE AND SUMMARY OF THE ACTION ........................................................................ 1

JURISDICTION AND VENUE ............................................................................................. 11

THE PARTIES ..................................................................................................................... 11

FACTS ................................................................................................................................ 13

     I.        BACKGROUND OF FANNIE MAE AND FREDDIE MAC ............................. 13

     II.      THE CONSERVATORSHIPS .............................................................................. 14

     III.    THE COMPANIES' PREFERRED STOCK AND COMMON
            STOCK ............................................................................................................... 16

     IV.    THE COMPANIES RETURN TO PROFITABILITY .......................................... 27

            A.     BY ENTERING INTO THE THIRD AMENDMENT, THE FHFA
                 AND THE TREASURY VIOLATED THEIR FIDUCIARY OBLIGATIONS
                 TO FANNIE MAE ............................................................................ 32

CLASS ACTION ALLEGATIONS ....................................................................................... 33

FHFA'S MANIFEST CONFLICT OF INTEREST .................................................................. 35

CAUSES OF ACTION ......................................................................................................... 37

     COUNT I BREACH OF CONTRACT
          (Against Fannie Mae, Freddie Mac and the FHFA) ........................................ 37

     COUNT II BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
          DEALING (Against Fannie Mae, Freddie Mac and the FHFA) .................... 38

     COUNT III VIOLATION OF THE APA TREASURY'S CONDUCT EXCEEDS ITS
          STATUTORY AUTHORITY ......................................................................... 39

     COUNT IV VIOLATION OF THE APA TREASURY'S CONDUCT WAS
          ARBITRARY AND CAPRICIOUS ............................................................... 42

     COUNT V VIOLATION OF THE APA FHFA'S CONDUCT EXCEEDS ITS
          STATUTORY AUTHORITY ......................................................................... 44

     COUNT VI VIOLATION OF THE APA FHFA'S CONDUCT WAS ARBITRARY AND
          CAPRICIOUS ................................................................................................ 46

COUNT VII BREACH OF FIDUCIARY DUTY
(Against the Treasury and the FHFA) ........................................................... 48

PRAYER FOR RELIEF ............................................................................................. 50

JURY TRIAL DEMANDED ....................................................................................... 51

Plaintiffs Marneu Holdings, Co. ("Marneu"), 111 John Realty Corp. ("John Realty"), and United Equities Commodities, Co. ("United Equities") ("Plaintiffs"), by the undersigned attorneys, submit this Class Action and Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and a class (the "Class," as defined herein) of holders of preferred stock or common stock issued by either the Federal National Mortgage Association ("Fannie Mae" or "Fannie") or the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie," Fannie Mae and Freddie Mac referred to collectively as the "Companies"), seeking damages and equitable relief, including rescission, for breach of contract or, in the alternative, breach of the implied covenant of good faith and fair dealing; a class action brought by Plaintiffs under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551-559, 701-06 seeking injunctive relief; and a derivative action brought by Plaintiffs on behalf of Fannie Mae and Freddie Mac, seeking damages and equitable relief, including rescission, for breach of fiduciary duty, in connection with the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment"), between the defendant United States Department of the Treasury ("Treasury") and the defendant Federal Housing Finance Agency ("FHFA") in its capacity as conservator for Fannie Mae and Freddie Mac.  Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the investigation of Plaintiffs' counsel.

2.      Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages.  While they are commonly referred to as "Government Sponsored Enterprises" or

"GSEs," Fannie Mae and Freddie Mac are not government agencies.  Instead, as private, for-profit corporations, the Companies have shareholders, directors, and officers like other non-governmental corporations, and their debt and equity securities have for years been privately owned and publicly traded, including by public pension funds, mutual funds, community banks, insurance companies, and myriad individual investors.

3.      Although both Fannie and Freddie were chartered by the U.S. Congress, the U.S. government did not guarantee, directly or indirectly, its securities or other obligations.  Fannie and Freddie were stockholder-owned corporations, and, before the 2008 financial crisis, their businesses were self-sustaining and funded exclusively with private capital.

4.      To raise capital, the Companies issued several publicly traded securities including common stock and numerous classes of non-cumulative preferred stock ("Preferred Stock").  The Preferred Stock, which had the essential characteristics of a fixed income security, was long perceived to be a conservative investment paying modest but reliable rates of return and carrying high credit ratings.  The common stock, in turn, participated in the earnings of the Companies for many years.  By 2008, Fannie Mae and Freddie Mac were two of the largest privately owned financial institutions in the world, and had been consistently profitable for decades.

5.      In July 2008, in response to the crisis in the residential housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating FHFA to oversee the operations of Fannie Mae and Freddie Mac.  Congress empowered FHFA to serve as Conservator to the Companies when necessary to preserve their financial health.  When acting as Conservator, FHFA is obligated to manage the Companies with the goal of putting them in a sound and solvent financial condition while preserving and conserving their assets. 12 U.S.C. § 4617(b)(2)(D).   Congress also authorized Treasury to provide limited

financial assistance to the Companies by purchasing securities issued by the Companies if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

6.      Just two months after HERA's enactment, on September 6, 2008, FHFA placed Fannie Mae and Freddie Mac into temporary conservatorship.   The objective of the conservatorship was to stabilize the institutions so they could return to their normal business operations.   Indeed, by statute, the purpose of appointing the conservator was "to preserve and conserve the [Companies'] assets and property and to put the [Companies] in a sound and solvent condition."   HERA expressly grants FHFA, as Conservator, the power to take such action as may be necessary to put the Companies in a "sound and solvent condition" and that is appropriate to "carry on the business of the Companies" and "preserve and conserve the[ir] assets and property."   FHFA itself vowed, at the time the Companies were placed into conservancy, that it was committed to operating the Companies "until they are stabilized" and that the conservatorship would be terminated upon successful completion of its plan to restore the Companies to "a safe and solvent condition."   The public was entitled to rely on these official statements of the purposes of the conservatorship, and public trading in the Companies' stock was allowed to, and did, continue.

7.      In connection with the appointment of FHFA as Conservator, Fannie Mae and Freddie Mac each entered into a Senior Preferred Stock Purchase Agreement with Treasury ("PSPA").   Under these agreements, Treasury would invest in a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), when and as necessary for the Companies to maintain a positive net worth.   In return for its commitment to purchase Government Stock, Treasury received $1 billion of Government Stock in each

Company as a commitment fee and warrants to acquire 79.9% of the common stock of the Companies at a nominal price. The Government Stock ranked senior in priority to all other series of Fannie Mae and Freddie Mac Preferred Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference, i.e., the sum of the $1 billion commitment fee plus the total amount of Government Stock outstanding. The warrants to acquire a 79.9% ownership stake in the Companies gave Treasury a significant "long" position – over and above the substantial 10% coupon on its Government Stock – which, if exercised, could result in enormous profits to the Government in the event the Companies returned to profitability.

8.     Shortly after being placed into conservatorship, the Companies, under the control of FHFA, wrote down their assets significantly. FHFA caused the Companies to declare large non-cash losses in the value of deferred tax assets, and to take out large loss reserves on their balance sheets. These accounting adjustments reflected exceedingly negative views about the Companies' future financial prospects and temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars. To fill the holes in the Companies' balance sheets created by these significant write-downs, Treasury immediately began purchasing Government Stock. By mid-2012, Treasury had invested approximately $189 billion in Government Stock, the majority attributable to these accounting adjustments, and the remainder to repay Treasury the hefty 10% coupon on its outstanding Government Stock – dividends that had ballooned to approximately $19 billion annually, or nearly $5 billion quarterly.

9.     Treasury made its investment in Fannie Mae and Freddie Mac pursuant to temporary authority established under Section 1117 of HERA. That authority expired on

4

December 31, 2009.  Before the authority expired, Treasury and FHFA made two substantive amendments to the PSPAs (neither of which are challenged in this lawsuit).

10.     By the second quarter of 2012, both Fannie Mae and Freddie Mac had returned to profitability and were solvent.  The Companies made a combined quarterly profit of $8.3 billion in the second quarter of 2012, or approximately 170% of the $5 billion quarterly dividend payable to Treasury on its Government Stock.  Thus, by no later than the end of the second quarter of 2012, the Companies were generating sufficient profits to pay a dividend on the Preferred Stock, from available cash, to private investors.  And once the 10% coupon on the Government Stock was paid in full, and the Companies' satisfied their contractual obligations to holders of the Preferred Stock, Treasury would also be entitled to dividends with respect to its ownership of 79.9% of the Companies' common stock (assuming exercise of Treasury's warrants).

11.     As the housing market recovered, it also became clear that the Companies' actual financial condition was never as bad as had been originally represented by FHFA.  For example, between 2008 and 2012, the Companies' actual realized loan losses were far less – by about $100 billion – than their anticipated losses.  As their financial conditions have improved, the Companies have been able to reverse the earlier write-downs of their deferred tax assets and loss reserves.  Significantly, the excessive write-downs were what caused Treasury to inject surplus funds into the Companies in the first place, triggering billions of dollars of payments back to Treasury under the 10% coupon on Government Stock, which, in turn, required further draw downs on Treasury's funding commitment.

12.     Consequently, by no later than the second quarter of 2012, Treasury was well-positioned to reap the fruits of investment in Fannie Mae and Freddie Mac.  As the housing

recovery gained traction, the stream of profits on Treasury's investments in the Companies was projected to continue, and grow, in the coming years. Indeed, coupled with the expected reversal of loss reserves and the write-up in value of other assets, the Companies' net worth was poised to increase by several hundred billion dollars. Treasury was entitled to a substantial 10% coupon on its Government Stock (now payable out of the Companies' available cash), and to 79.9% of the Companies' profits going forward, subject to the Companies' fulfillment of their contractual obligations to the holders of their Preferred Stock. In addition, the Treasury, through FHFA, as Conservator, could force Fannie Mae and Freddie Mac to begin repaying the principal of the Treasury's investment in the Companies by redeeming Treasury's Government Stock.

13. Instead, Treasury insisted on all of the Companies' profits, forever. Accordingly, rather than exercising its right to purchase up to 79.9% of the Companies' common stock or taking steps to enable the Companies to redeem the Government Stock, FHFA, as Conservator, and Treasury acted together to ensure that Treasury would be the sole beneficiary of the Companies' improved financial position.

14. Specifically, FHFA and Treasury announced the "Third Amendment" to the PSPAs. The Third Amendment had devastating consequences for holders of the Preferred Stock and common stock. In place of the 10% coupon due on Treasury's Government Stock, the Third Amendment changed the PSPAs so as to entitle the Treasury to a dividend of 100% of all current and future profits of the Companies. As a result of this purported "amendment" to the terms of the Companies' PSPAs with Treasury, Fannie Mae and Freddie Mac would be left with no funds to redeem Treasury's Government Stock or distribute to the holders of Preferred Stock or common stock, whether by dividend, redemption, or in a liquidation. Indeed, since the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac, the Government would

6

receive a liquidation preference that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury would receive the full amount of their net worth in that liquidation.    This alteration of the dividend on the Government Stock was so dramatic that the FHFA effectively created, and the Treasury effectively purchased, a new security.

15.    The Third Amendment, which Fannie Mae, Freddie Mac, and the Government implemented without seeking or obtaining the consent of the holders of Preferred Stock or common stock as contractually required, sidestepped the rules of priority, eliminated the contractual rights of the Preferred Stock and common stock holders, and expropriated for the Government the economic value of these publicly-held securities.  As Treasury stated on the day of the announcement, the Third Amendment was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will . . . benefit taxpayers."

16.    Neither the Companies nor their private investors received any meaningful value in return for the Third Amendment.  As noted above, under the Third Amendment the amount of cash the Companies transfer to Treasury as a dividend does not reduce the amount of the Government Stock outstanding.  Thus, regardless of how much money the Companies send to Treasury, all of the Government Stock will remain outstanding, and Treasury will continue to take substantially all of the Companies' net worth, as long as they remain in business. The Third Amendment thus enriches the federal government through a self-dealing arrangement, and destroys tens of billions of dollars of value in the Companies' Preferred Stock and common stock.   Treasury and FHFA effectively nationalized two of the nation's biggest financial institutions, after they returned to profitability and while the FHFA was supposed to be serving as their Conservator.

17.     Treasury has reaped immense profits via the Third Amendment.  On or about June 30, 2013, the Companies collectively paid Treasury a *$66.3 billion* dividend – more than fourteen times the $4.7 billion that Treasury would have received under the original 10% coupon on its Government Stock.  Moreover, Treasury and the FHFA maintain that this excess payment of $61.6 billion somehow does not represent a return on capital invested, and therefore do not take it into account as a repayment of funds that Treasury advanced to the Companies.  Therefore, the liquidation preference of Treasury's Government Stock has not been reduced and stands at $189 billion (with approximately $117 billion attributable to Fannie Mae and $72 billion attributable to Freddie Mac) – i.e., the same amount as of the time of the Third Amendment.  As a result of the Third Amendment, Treasury's annualized rate of return on its Government Stock for the applicable quarter is a staggering 140%.

18.     The statutes and regulations governing Treasury and FHFA did not authorize them to enter into the Third Amendment, and in fact, the FHFA's actions were contrary to its statutory responsibility as Conservator to take those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D).  Treasury likewise acted outside its statutory authority to purchase the Companies' securities by effectively acquiring new securities in Fannie Mae and Freddie Mac more than two years after that statutory authority expired.

19.     The Third Amendment has stripped Fannie Mae and Freddie Mac of their ability to rebuild their capital reserves or to distribute dividends to Plaintiffs, the other members of the Class, or other holders of Fannie Mae and Freddie Mac stock.  Furthermore, the Companies are not permitted to redeem the Treasury's Government Stock.  Moreover, by appropriating the

entirety of the Companies' net worth for the government's coffers on a quarterly basis, the Third Amendment has effectively eliminated the property and contractual rights of Plaintiffs and the Class to receive their liquidation preference upon the dissolution, liquidation or winding up of Fannie Mae and Freddie Mac.  Indeed, the FHFA and the Treasury took away the Class's rights:

- o To receive dividend payments.  Under the terms of the  Preferred Stock certificates of designation ("Certificates" or "Certificates of Designation"), Fannie Mae and Freddie Mac owed Plaintiffs and the other members of the Class dividends, if declared, to the extent that the Companies earned profits above and beyond their requirement to pay the 10% dividend on the Treasury's Senior Preferred Stock.  As of the second quarter of 2012, the quarters leading up to this filing, and for the foreseeable future, Fannie Mae and Freddie Mac's profits have exceeded or will likely exceed that threshold; and,

- o To receive a liquidation distribution upon Fannie Mae and Freddie Mac's dissolution, liquidation or winding up, a right which was still worth a substantial amount of money even though it was junior to the liquidation preference of the Senior Preferred Stock.

20.     Plaintiffs and the other members of the Class paid valuable consideration in exchange for these contractual rights, and in doing so helped provide financial support for Fannie Mae and Freddie Mac's business both before and after the imposition of the conservatorship. Indeed, even after the imposition of the conservatorship, the contractual rights of Plaintiffs and the other members of the Class had substantial market value – market value that swiftly dissipated in the wake of the Third Amendment.

21.     The current projections for Fannie Mae and Freddie Mac's continued profitability show that over approximately the next year, they will be able not only to repay all of the money the Companies' drew down from the Treasury, but also to pay the requisite 10% annual dividend.  But for the Third Amendment, Fannie Mae and Freddie Mac would be capable of paying billions in dollars in profits to the holders of their other Preferred Stock, including the members of the Class.  Due to the Third Amendment, that money will all accrue to the Treasury instead.   The Treasury will receive a massive surplus above and beyond its pre-Third Amendment contractual entitlements, and Plaintiffs and the other members of the Class will receive nothing.

22.     Entry into the Third Amendment by Treasury and the FHFA, in its capacity as conservator for Fannie Mae and Freddie Mac, was not an arm's length agreement, and was in breach of the express terms of the Certificates of the Preferred Stock or, in the alternative, in breach of the implied covenant of good faith and fair dealing inherent in such Certificates.  This action seeks an award of compensatory damages for such breach to Plaintiffs and the other members of the Class and/or equitable relief with respect to such breach, including rescission of the Third Amendment.

23.     Moreover, the Treasury, as *de facto* controlling stockholder of Fannie Mae and Freddie Mac, stood on both sides of the decision to implement the Third Amendment.  Although the Treasury has gained, and will gain, enormous benefits from the Third Amendment, Fannie Mae and Freddie Mac received nothing in return.  As such, the Third Amendment was, and is, waste and not entirely fair to Fannie Mae and Freddie Mac, and constituted a breach of the fiduciary duties owed to Fannie Mae and Freddie Mac by the FHFA and the Treasury, as Fannie Mae's controlling stockholder.  Accordingly, this action also seeks, derivatively on behalf of

Fannie Mae, an award of compensatory damages and disgorgement for such breach and/or equitable relief with respect to such breach, including rescission of the Third Amendment.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1723a(a) and 4617.  This action also arises under the APA, 5 U.S.C. §§ 551-559, 701-706, and HERA, 12 U.S.C. §§ 1452(c), 1455, 1719, 1723a(a), and 4617.  Thus, the Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2)(A) in that the Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs.  The Court also has subject matter jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

25.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have engaged in numerous activities and conducted business here, which had an effect in this district.

## THE PARTIES

26.     Plaintiff Marneu is a New York General Partnership, with offices in New York, N.Y.

27.     Plaintiff John Realty is a New York "S" Corporation, with offices, in New York, N.Y.

28.     Plaintiff United Equities is a New York General Partnership, with offices in New York, N.Y.

29.     Plaintiffs each are current holders of Fannie Mae and Freddie Mac Preferred Stock, and have been holders of Fannie Mae  and Freddie Mac Preferred Stock prior to September 6, 2008, as well as prior to and on August 17, 2012, and has been a holder of Fannie Mae  and Freddie Mac Preferred Stock throughout the relevant time period.

30.      Collectively, Plaintiffs invested more than $75 million in Fannie Mae and Freddie Mac Preferred stock, representing more than 3.5 million shares at par value of $25.00, as of August 17, 2012.

31.     Defendant FHFA, as conservator of Fannie Mae, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street, S.W., Washington, D.C., 20024, and therefore is a citizen of the District of Columbia. According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of Fannie Mae and Freddie Mac… with responsibility of overseeing management and governance of the Enterprise[]."

32.     Defendant Treasury is an executive agency of the United States government with its headquarters located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220, and therefore is a citizen of the District of Columbia.  The Department of the Treasury owns Fannie Mae's Senior Preferred Stock, and is a signatory to certain agreements central to this Complaint.

33.     Defendant and nominal defendant Fannie Mae is a federally-chartered Government-Sponsored Enterprise with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016, and therefore is a citizen of the District of Columbia.

34.     Defendant and nominal defendant Freddie Mac is a federally chartered Government-Sponsored Enterprise with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia.

## FACTS

**I.     Background Of Fannie Mae And Freddie Mac**

35.     Fannie Mae and Freddie Mac are stockholder-owned corporations organized and existing under the Federal National Mortgage Act and the Federal Home Loan Corporation Act, respectively.  Fannie Mae was established in 1938 as a federal agency to provide the mortgage market with supplemental liquidity, and was converted to a private corporation in 1968.  Freddie Mac was created as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient. Both Companies are GSEs, which are private corporations that Congress created to increase mortgage market liquidity.  They seek to accomplish this by purchasing mortgages that private banks originate and bundling them into mortgage-related securities to be sold to investors.  Through the creation of this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

36.     Notwithstanding their government charters, private shareholders owned Fannie Mae and Freddie Mac until 2007. Before 2007, they were consistently profitable.  In fact, prior to that time, the most recent full-year loss for Fannie Mae was in 1985, while the most recent full-year loss for Freddie Mac was in 1989.

37.     In 2007, however, the mortgage market began a steep decline as the troubled economy resulted in larger numbers of mortgage loan delinquencies and defaults. The market's confidence in the financial health of the Companies also declined sharply.  At the time, numerous government officials sought to allay these concerns and affirm that the Companies remained financially strong. For example, James B. Lockhart, then-Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") and later Director of FHFA, stated that the Companies were "adequately capitalized, holding capital well in excess of [regulatory

requirements]" and had "large liquidity portfolios, access to the debt market and over $1.5 trillion in unpledged assets."  Press Release, OFHEO, Statement of OFHEO Director James B. Lockhart (July 10, 2008).

38.     Nevertheless, because of the importance of housing to the economy and the need to provide the market with confidence, Congress intervened and passed HERA.  HERA created FHFA, which assumed the regulatory responsibilities that had been vested in OFHEO.  HERA authorized FHFA to place the Companies in conservatorship or receivership under certain circumstances that were statutorily defined.

## II.     The Conservatorships

39.     Shortly after HERA was enacted, Fannie Mae and Freddie Mac were placed into conservatorship by FHFA. As the Conservator for the Companies, FHFA became responsible for "preserv[ing] and conserv[ing] [their] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).  FHFA committed to "operate the [Companies] Enterprises until they are stabilized."  Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008).  Acting Director DeMarco confirmed this operating framework and stated that the "statutory purpose of conservatorship is to preserve and conserve each [C]ompany's assets and put them in a sound and solvent condition . . . to help restore confidence in the [C]ompanies, enhance their capacity to fulfill their mission, and [to] mitigate the systemic risk that contributed directly to instability in financial markets."  Statement of Edward J. DeMarco, Acting Director, FHFA, Before the United States House of Representatives Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, at 2 (Sept. 15, 2010).

40.     Treasury was authorized under HERA to strengthen the Companies' balance sheets by purchasing their securities, within set time frames and consistent with prescribed

statutory requirements.   Beginning with HERA's enactment in 2008 until the end of 2009,

Congress authorized Treasury to "purchase any obligations and other securities issued by the

[Companies] . . . on such terms and conditions as the Secretary may determine and in such

amounts as the Secretary may determine." 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A).   To

exercise this authority, the Secretary was required to determine that purchasing the Companies'

securities was "necessary to . . . provide stability to the financial markets; prevent disruptions in

the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B),

1719(g)(1)(B).   The Secretary was required to consider several factors in making these

determinations:

> (i) [t]he need for preferences or priorities regarding payments to the Government; (ii) [l]imits on maturity or disposition of obligations or securities to be purchased; (iii) [t]he [Companies'] plan[s] for the orderly resumption of private market funding or capital market access; (iv) [t]he probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment; (v) [t]he need to maintain the [Companies'] status as private shareholder-owned compan[ies]; [and] (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(l)(1)(C), 1719(g)(1)(C).

41.    Treasury used its temporary authority under HERA to enter into the PSPAs with

FHFA, which acted on behalf of both Companies.   The PSPAs are identical in all material

respects.   Under the PSPAs, Treasury purchased 1 million shares of Government Stock from

each company in exchange for allowing the Companies to draw up to $100 billion each from

Treasury.  The Government Stock has a liquidation preference equal to $1 billion plus the sum of

all draws by each company against Treasury's funding commitment.   The Government Stock is

also entitled to a cumulative dividend equal to 10% of the outstanding liquidation preference.   If

a company pays a dividend, the PSPAs require the Treasury to be paid dividends declared in full,

but not paid, for prior dividend periods, before any privately held securities may receive a dividend.  Indeed, the PSPAs explicitly prohibit any shareholder other than Treasury from being paid any dividend without Treasury's consent.   Further, if the Companies liquidate, no shareholder can recover anything before the Treasury recovers the full liquidation value of its shares.  Treasury also has the right under the PSPAs to purchase up to 79.9% of the Companies' common stock at a nominal price.

42.     At the end of 2009, Treasury's statutory authority to purchase the Companies' securities expired. To enable Treasury to provide the Companies with liquidity beyond 2009, Treasury and FHFA amended the PSPAs twice.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per company from $100 billion per company.  Then, on December 24, 2009, just before the expiration of Treasury's temporary authority under HERA, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

III.     **The Companies' Preferred Stock And Common Stock**

43.     The Companies have issued common stock and several series of Preferred Stock that are, as a result of the PSPAs, subordinate to the Government Stock. Prior to September 6, 2008, Fannie Mae had issued common stock and several series of Preferred Stock, including:

## FANNIE MAE STOCK

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 586 109 | FNMA |
| 5.25% Non-Cumulative Preferred Stock, Series D | 313 586 505 | FDDXD |
| 5.10% Non-Cumulative Preferred Stock, Series E | 313 586 604 | FNMFM |
| Variable Rate Non-Cumulative Preferred Stock, Series F | 313 586 703 | FNMAP |
| Variable Rate Non-Cumulative Preferred Stock, Series G | 313 586 802 | FNMAO |
| 5.81% Non-Cumulative Preferred Stock, Series H | 313 586 885 | FNMAM |
| 5.375% Non-Cumulative Preferred Stock, Series I | 313 586 877 | FNMAG |
| 5.125% Non-Cumulative Preferred Stock, Series L | 313 586 844 | FNMAN |
| 4.75% Non-Cumulative Preferred Stock, Series M | 313 586 836 | FNMAL |
| 5.50% Non-Cumulative Preferred Stock, Series N | 313 586 828 | FNMAK |
| Variable Rate Non-Cumulative Preferred Stock, Series O | 313 586 794 | FNMFN |
| 5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock | 313 586 810 | FNMFO |
| Variable Rate Non-Cumulative Preferred Stock, Series P | 313 586 786 | FNMAH |
| 6.75% Non-Cumulative Preferred Stock, Series Q | 313 586 778 | FNMAI |
| 7.625% Non-Cumulative Preferred Stock, Series R | 313 586 760 | FNMAJ |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S | 313 586 752 | FNMAS |
| 8.25% Non-Cumulative Preferred Stock, Series T | 313 586 737 | FNMAT |

44.     Likewise, prior to September 6, 2008, Freddie Mac had issued common stock and

several series of Preferred Stock, including:

### FREDDIE MAC STOCK

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 400 301 | FMCC |
| 5.1% Preferred Stock, due 12/31/2049 | 313 400 814 | FREJO |
| 5.3% Non-Cumulative Perpetual Preferred Stock | 313 400 822 | FREJP |
| 5.81% Perpetual Preferred Stock | 313 400 889 | FREGP |
| Variable-Rate Preferred Stock, Series B | 313 400 608 | FMCCI |
| 5% Preferred Stock, Series F | 313 400 863 | FMCKK |
| Variable-Rate Preferred Stock, Series G | 313 400 848 | FMCCG |
| 5.1% Preferred Stock, Series H | 313 400 855 | FMCCH |
| 5.79% Preferred Stock, Series K | 313 400 830 | FMCCK |
| Variable-Rate Preferred Stock, Series L | 313 400 798 | FMCCL |
| Variable-Rate Preferred Stock, Series M | 313 400 780 | FMCCM |
| Variable-Rate Preferred Stock, Series N | 313 400 764 | FMCCN |
| 5.81% Preferred Stock, Series O | 313 400 772 | FMCCO |
| 6% Preferred Stock, Series P | 313 400 749 | FMCCP |
| Variable-Rate, Series Q | 313 400 756 | FMCCJ |

| | | |
|---|---|---|
| 5.7% Preferred Stock, Series R | 313 400 731 | FMCKP |
| Variable-Rate, Series S | 313 400 715 | FMCCS |
| 6.42% Preferred Stock, Series T | 313 400 699 | FMCCT |
| 5.9% Preferred Stock, Series U | 313 400 681 | FMCKO |
| 5.57% Preferred Stock, Series V | 313 400 673 | FMCKM |
| 5.66% Preferred Stock, Series W | 313 400 665 | FMCKN |
| 6.02% Preferred Stock, Series X | 313 400 657 | FMCKL |
| 6.55% Preferred Stock, Series Y | 313 400 640 | FMCKI |
| Fixed-to-Floating Rate Preferred Stock, Series Z | 313 400 624 | FMCKJ |

45.     This Preferred Stock and common stock, which was issued prior to the issuance of

the Government Stock, is held by private investors such as pension funds, community banks,

insurance companies, and individual investors.   As of March 31, 2013, the Companies'

outstanding Preferred Stock had an aggregate liquidation preference of $33 billion.   Each class of

Preferred Stock has its own contractual dividend rate and liquidation value.   Plaintiffs own

Preferred Stock issued by the Companies; Plaintiff began purchasing these shares in reliance on

the terms of the Government Stock before the Third Amendment altered those terms.

46.     Prior to September 8, 2008, each series of Fannie Mae Preferred Stock ranked on

a parity with all other issued and outstanding series of Fannie Mae Preferred Stock as to the

payment of dividends and the distribution of assets upon dissolution, liquidation or winding up

of Fannie Mae, and each series of Freddie Mac Preferred Stock ranked on a parity with all other

issued and outstanding series of Freddie Mac Preferred Stock as to the payment of dividends and

the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac.   In other

words, each series of Fannie Mae and Freddie Mac Preferred Stock carried equal contractual rights to with regards to the dividends, and each series of Fannie Mae and Freddie Mac Preferred stock carried equal liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac.

47.     Prior to September 6, 2008, Fannie Mae and Freddie Mac each regularly declared and paid dividends on each series of their respective Preferred Stock.

48.     The Certificate of Designation for each series of Preferred Stock constitutes a contract with provisions governing the holders' dividend, liquidation rights and amendments to the terms of the Preferred Stock.   These provisions are materially similar to, for example, the Certificate of Designation for Fannie Mae's Series T Preferred Stock, as described below:

**2.      Dividends.**

(a) Holders of record of Series T Preferred Stock (each individually a "Holder," or collectively the "Holders") ***will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor, non-cumulative cash dividends at [specified rate] per annum of the [specified] stated value . . . of Series T Preferred Stock.***

\* \* \*

**4.      Liquidation Rights.**

(a)      Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock ***will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders,*** before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, junior to the Series T Preferred Stock), ***the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or***

*not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment*, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods.

(b)     If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series T Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series T Preferred Stock, the assets will be distributed to the Holders of Series T Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).

* * *

**7.     Voting Rights; Amendments.**

* * *

(b)     Without the consent of the Holders of Series T Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the Series T Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the Series T Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation *so long as such action does not materially and adversely affect the interests of the Holders of Series T Preferred Stock*; provided, however, that any increase in the amount of authorized or issued Series T Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series T Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series T Preferred Stock.

(c)     *Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the Series T Preferred Stock may be amended, altered, supplemented, or repealed only with the*

21

> ***consent of the Holders of at least two-thirds of the shares of Series T Preferred Stock then outstanding,*** given in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of Series T Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of Series T Preferred Stock will be entitled to one vote per share.[1]

49.     The Certificate of Designation for the common stock issued by Freddie Mac constitutes a contract with provisions governing the holders' dividend, liquidation rights and amendments to the terms of the common stock.  These provisions provide, in pertinent part:

> **2.      Dividends.**
>
> (a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor.  The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors"). Each such dividend shall be paid to the holders of record of outstanding shares of the Common Stock as they appear in the books and records of Freddie Mac on such record date, not to be earlier than 45 days nor later than 10 days preceding the applicable dividend payment date, as shall be fixed in advance by the Board of Directors.
>
> * * *
>
> **8.      Liquidation Rights.**
>
> (a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other class or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share,

---

[1] All emphasis added unless otherwise noted.

plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution. The holders of the outstanding shares of any class or series of stock of Freddie Mac ranking prior to, on a parity with or junior to the Common Stock upon liquidation shall also receive out of such assets payment of any corresponding preferential amount to which the holders of such stock may. by the terms thereof, be entitled.   Thereafter, subject to the foregoing and to the provisions of paragraph (b) of this Section 8, the balance of any assets of Freddie Mac available for distribution to stockholders upon such dissolution, liquidation or winding up shall be distributed to the holders of outstanding Common Stock in the aggregate.

(b)  Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Common Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 8 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Common Stock have been paid all amounts to which such classes or series of stock are entitled pursuant to their respective terms.

* * *

**10.      Miscellaneous.**

* * *

 (h)(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock.

50.      The Certificate of Designation for Freddie Mac's common stock provides for similar rights.  In particular, it provides that:

***

23

**2. Dividends.**

(a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor. The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors").

\*\*\*

**8. Liquidation Rights.**

(a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets; of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other cl ass or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share, plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution.

\*\*\*

**10. Miscellaneous**

\*\*\*

 (h) Freddie Mac, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i) Without the affirmative vote of the holders of the Common Stock, Freddie Mac may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not materially and adversely affect the interests of the holders of the Common Stock.

(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration,

24

supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock.

51.     On information and belief, similar contractual rights govern the dividend, liquidation rights, and amendments to the terms of Fannie Mae common stock under Fannie Mae's charter documents, Certificates of Designation, and/or applicable law.

52.     Thus, the Companies were contractually barred from amending the terms of the Preferred Stock or common stock held by the Class in a manner that had a material and adverse impact on stockholders, unless they first received the permission of two-thirds of the affected holders.  The Companies neither sought nor obtained such permission before entering into the Third Amendment.  There can be no doubt that the Third Amendment made "materially adverse" changes to rights of the holders of Preferred Stock and common stock, such that it violated the Class's contractual rights.

53.     Before FHFA placed the Companies into conservatorship, Fannie Mae and Freddie Mac Preferred Stock enjoyed strong credit ratings, with all three major credit rating agencies assigning high investment-grade ratings on the Preferred Stock from the dates of issuance until 2008. Treasury and other federal agencies encouraged private entities to invest in the Companies, and baking regulators permitted banks to carry the Companies' Preferred Stock on their balance sheets at a lower risk weighting than other companies' preferred stock. Similarly,

54.     When the Companies entered conservatorship, FHFA suspended payment of dividends on all Preferred Stock and common stock, and the PSPAs explicitly prohibit payment of any such dividends without Treasury's consent.  As a result, no dividends have been paid to the holders of the Companies' Preferred Stock and common stock since 2008.

55. After the FHFA took control of the Companies, it decided that it did not expect them to be profitable, and that they would likely incur large losses in the coming years. The FHFA therefore directed the Companies to book substantial loss reserves – recording loan losses before they were actually incurred – and required the Companies to eliminate from their balance sheets the value of non-cash deferred tax assets that the Companies would have to be profitable in order to make use of.

56. These write-downs and accounting decisions directed by the FHFA led to a circular payment obligation requiring the Companies to draw down Treasury's funding commitment, which, in turn, required the Companies to pay increased dividends to Treasury. Under the initial PSPA, Treasury committed to make quarterly payments to the Companies in order to maintain a zero net worth. Each quarter, the FHFA looked to the Companies' financial statements to determine if their liabilities exceeded their assets. If so, the FHFA would request that Treasury draw down Fannie Mae's funding commitment and provide funds equal to the net worth deficit. Because of the impact of the accounting adjustments directed by the FHFA, the Companies had less capital, and therefore needed capital from Treasury both to operate and to pay the the quarterly dividends due under the PSPAs. The Companies were thus required to draw additional funds from Treasury's funding commitment, thereby increasing the amount of Treasury's aggregate liquidation preference, and thus the amount of dividends payable to Treasury. Between 2008 and 2012, under the PSPAs, as amended, Treasury provided approximately $187 billion to the Companies and received approximately $55 billion in return in the form of dividends and other fees.

57. Throughout this time, the Companies continued to be managed in conservatorship by FHFA. HERA empowered FHFA to force the Companies into receivership and to liquidate

their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA has always maintained that its relationship with the Companies is that of Conservator rather than liquidator. *See* News Release FHFA, A Strategic Plan For Enterprise Conservatorships: The Next Chapter In A Story That Needs An Ending, at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide *the conservatorships.*") (emphasis added).

## IV.   The Companies Return To Profitability

58.   In 2012, it became clear that the FHFA has overestimated the Companies' likely losses and possibility of a return to profitability.  For example, their actual loan losses were far less than anticipated.  In fact, between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Company to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period, such that the projected losses had been overestimated by $109 billion.

59.   Contrary to the FHFHA's 2008 projections, the Companies posted profits of more than $10 billion in the first two quarters of 2012.  Even more importantly, the Companies disclosed that they expected to be consistently profitable for the foreseeable future, such that they would eventually be able to remove the valuation allowance against their deferred tax assets, worth approximately $100 billion.

60.   Thus, the Companies were positioned to pay back the government for the support they had received, with money left over to provide a financial return to their private investors. Yet instead of either allowing the Government Stock to be redeemed or compensating private investors for the excess value that the Companies were providing, Treasury and FHFA instead implemented the Third Amendment to ensure that private investors would be locked out of this recovery.

27

61.     The return of Fannie Mae and Freddie Mac to profitability in 2012 led to a substantial increase in the trading prices of the Companies' Preferred Stock.  In fact, each series of Fannie Mae Preferred Stock increased between 67% and 115%, with an average of 83%, from May 1, 2012, to August 17, 2012, up until the time that Treasury issued a news release announcing the Third Amendment.  The Series P Preferred Stock, for example, increased by 83% during that time period, only to decline significantly after the Third Amendment was announced:



62.     Similarly, each series of Freddie Mac Preferred Stock increased on average of 86% from May 1, 2012, to August 17, 2012.  The Series X Preferred Stock, for example, increased by 84% during that time period, but suffered a material decline after the Third Amendment was announced:



**The Net Worth Sweep**

63.     With Fannie Mae's and Freddie Mac's return to consistent and record profitability, the holders of the Preferred Stock and common stock had reason to believe and expect that they would in time regain a return on their investment. They also had a reasonable expectation that the Companies would eventually be healthy enough to redeem the Government Stock, exit conservatorship, and be "return[ed] to normal business operations," as FHFA's Director had vowed when the conservatorship was established.

64.     These reasonable and realistic expectations of the holders of the Preferred Stock and common stock did not last long, however, due to the Government's own self-dealing rather than any change in the outlook for the housing market, broader economy, or the financial performance of the Companies.

65.     As noted above, FHFA agreed to sweep all the Companies' profits to Treasury exactly when they had returned to stable profitability. At a dividend rate of 10%, Treasury's

29

approximately $189 billion in outstanding Government Stock earn annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion. Thus, in any quarter in which the Companies' combined profits exceed $4.7 billion (or more precisely, any quarter in which Fannie Mae or Freddie Mac's profits exceed the dividend owed on their Government Stock), that value would inure to the benefit of the private shareholders *but for the Third Amendment.*

66.     In an August 17, 2012 press release announcing the modification of the PSPA, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." It called the amendment a full income sweep of "every dollar of profit that [the] firm earns going forward," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." This language was in stark contrast to their earlier representations that they sought only to "stabilize" the Companies and return them "to normal business operations" (as well as the February 2, 2010 statement of Edward DeMarco, Acting Director of the FHFA, that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters.").

67.     Treasury will receive a windfall in payments of dividends under the Third Amendment. In 2012, the Companies made combined profits of more than $28 billion. In the first quarter of 2013, they posted combined profits of approximately $15 billion, Fannie Mae

added approximately $51 billion to its balance sheet by reversing write-downs of deferred tax assets, and Freddie Mac may soon be able to recognize tens of billions of dollars in deferred tax assets as well.  At the end of the second quarter of 2013, the Third Amendment required the Companies to pay $66.3 billion to Treasury.

68.     The President's proposed fiscal year 2014 budget estimates that Fannie Mae and Freddie Mac will together pay $238.5 billion in dividends to Treasury over the next ten years, far outstripping the government's investments.  Even this figure likely underestimates the total value of the dividends that Treasury is likely to receive via the Third Amendment, since the budget was released before Fannie Mae announced its decision to release its deferred tax assets.

69.     In sum, the Government is now expropriating "every dollar of earnings that each firm earns" on a quarterly basis.  This guarantees that there can never be a distribution to the holders of Preferred Stock or common stock no matter how much income the Companies earn and no matter how much their assets are worth in any liquidation.  That is, the Preferred Stock and common stock holders' stake in the Companies has been taken, in quarterly installments, since the moment the Third Amendment took effect, and this taking of their property will continue until the last dime has been extracted from the Companies if, and when, they are wound up.

70.     Plaintiffs and other holders of the Preferred Stock and common stock had a reasonable, investment-backed expectation in the value of their right to a portion of the profits earned by the Companies and, thus, in the future dividends their stock would pay, if the Companies once again become profitable and restored to sound and solvent condition.  Just as the Federal Government cannot seize corporate assets for a public purpose without paying just compensation, so too it cannot seize corporate stock to accomplish the same end.

31

A. BY ENTERING INTO THE THIRD AMENDMENT, THE FHFA AND THE TREASURY VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FANNIE MAE

71. By reason of its purported conservatorship of Fannie Mae and Freddie Mac and because of its ability to control the business and corporate affairs of Fannie Mae and Freddie Mac, the FHFA owed the Companies and their shareholders fiduciary obligations of due care, good faith, loyalty, and candor, and was and is required to use its utmost ability to control and manage Fannie Mae and Freddie Mac in a fair, just, honest, and equitable manner. The FHFA was and is required to act in furtherance of the best interests of the Companies and their shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of the FHFA, the Treasury, or the federal government. Because of its position of control and authority as the purported conservator of Fannie Mae and Freddie Mac, the FHFA was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72. The Treasury exercises *de facto* control over Fannie Mae and Freddie Mac, including through its Senior Preferred Stock, and warrants to purchase the Companies' common stock, as well as its control of the provision of funds to Fannie Mae and Freddie Mac. As controlling stockholder of Fannie Mae and Freddie Mac, the Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and Freddie Mac and its other stockholders. Because of the Treasury's *de facto* position of control and authority over Fannie Mae and Freddie Mac, it stood on both sides of the decision to engage in the Third Amendment and it was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73. The Third Amendment offered no benefits whatsoever to Fannie Mae and Freddie Mac or its minority shareholders. Rather, it was an egregiously self-dealing transaction, the

benefits of which flowed entirely to the Treasury as Fannie Mae and Freddie Mac's controlling shareholder, and indirectly to the FHFA through its status an agency of the federal government.

74. The Third Amendment was in no way an exercise of valid business judgment or deemed to be in the best interests of Fannie Mae and Freddie Mac. Indeed, it was specifically intended to ensure that Fannie Mae and Fredde Mac's shareholders could never again recover any value from their investments, and to ensure that the Company could not function as a private enterprise and would have to be wound down. By preventing Fannie Mae and Freddie Mac from rebuilding capital or returning to the market, as Treasury stated in its press release, the purpose and effects of the Third Amendment ran directly contrary to the FHFA's purported statutory mission to "put the regulated entity in a sound and solvent condition," "carry on the business of the regulated entity," and "preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D).

## CLASS ACTION ALLEGATIONS

75. With respect to Counts I through VI hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a Class consisting of all persons and entities who held shares of Fannie Mae Preferred Stock, Fannie Mae common stock, Freddie Mac Preferred Stock, and/or Freddie Mac common stock and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants.

76. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac

Preferred Stock and common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Fannie Mae and Freddie Mac and/or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Fannie Mae or Freddie Mac stock during the class period, and were similarly affected by Defendants' wrongful conduct that is complained of herein.

78.     Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class action, derivative and securities litigation.  Plaintiffs have no interests that are adverse or antagonistic to the Class.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

80.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   a) Whether one or more Defendants breached the terms of the Certificates for the Preferred Securities and common stock or, in the alternative, the implied covenant of good faith and fair dealing inherent in those Certificates;

   b) Whether one or more Defendants breached the terms of the Certificates for the Preferred Securities and common stock or, in the alternative, the implied covenant of good faith and fair dealing inherent in those Certificates;

   c) Whether the Treasury breached its fiduciary duties to the members of the Class;

    d)  Whether the FHFA and Treasury were acting within their statutory authority at the time it entered into the Third Amendment;

    e)  Whether the FHFA and Treasury's actions were arbitrary and capricious; and

    f)  Whether the members of the Class are entitled to injunctive relief, including rescission, and/or one or more Defendants are liable for damages to the members of the Class, and the proper measure thereof, for breaches of contract, the implied covenant of good faith and fair dealing, and/or breach of fiduciary duty.

81.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

82.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## FHFA'S MANIFEST CONFLICT OF INTEREST

83.    With respect to Count VII hereof, Plaintiffs bring action derivatively on behalf of and for the benefit of Fannie Mae and Freddie Mac to redress injuries suffered by Fannie Mae and Freddie Mac as a direct and proximate result of the breaches of fiduciary duty alleged herein. For purposes of Count VII, Fannie Mae and Freddie Mac are named as nominal defendants in a derivative capacity.

84.    Plaintiffs are holders of Fannie Mae and Freddie Mac Preferred Stock, and were holders such securities prior to September 6, 2008, including prior to and on August 17, 2012, and have been holders of said securities continuously since then.  Plaintiffs have retained counsel that is competent and experienced in class action, derivative and securities litigation.

85.     Plaintiffs intend to retain their shares of preferred securities throughout the duration of this litigation.

86.     The breaches of fiduciary duty complained of herein subject, and will persist in subjecting, Fannie Mae and Freddie Mac to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

87.     To the extent any demand requirement with respect to the FHFA would otherwise be applicable in this context, such demand is excused and Plaintiffs are entitled to pursue the derivative claim alleged herein as a result of the FHFA's manifest conflict of interest.

88.     The Treasury exercises *de facto* control over Fannie Mae and Freddie Mac, including through its Senior Preferred Stock and warrants to purchase Fannie Mae and Freddie Mac common stock, as well as its control of the provision of funds to Fannie Mae and Freddie Mac.  The Secretary of the Treasury also sits on the FHFA Oversight Board.  With such *de facto* power over the Companies' strategies and operations, the Treasury is in a position to, and does, direct the FHFA with respect to determinations affecting the Companies and their stockholders.

89.     The FHFA is interested in and benefits from the Third Amendment as an agency of the federal government, and cannot reasonably be expected to initiate litigation for the breaches of fiduciary duty alleged herein, which would be asserted against itself and the Treasury, Fannie Mae's controlling stockholder.   Indeed, the Treasury and FHFA face a substantial threat of liability with respect to the breach of fiduciary duty claim.

90.     Notwithstanding its fiduciary duties to Fannie Mae, Freddie Mac and its stockholders, the FHFA has expressly acknowledged that it does not act with the interests of Fannie Mae and Freddie Mac  shareholders in mind.  Indeed, Fannie Mae's 2008 10-K, frankly

disclosed that, since the imposition of the conservatorship, the cp,[amy was "[n]o longer managed with a strategy to maximize common shareholder returns."

91.     Accordingly, the FHFA has a manifest conflict of interest that makes it incapable of pursing the derivative claim for breach of fiduciary duty alleged herein.  Given the Treasury's *de facto* controlling stockholder status and the FHFA's close relationship to the Treasury in connection with Fannie Mae and Freddie Mac matters, a derivative action offers the only reasonable avenue for the pursuit of the breach of fiduciary duty claim.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

### (Against Fannie Mae, Freddie Mac and the FHFA)

92.     Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     The Certificates for the Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Class and Fannie Mae and Freddie Mac.

94.     The Certificates for the Preferred Stock provide for contractually-specified dividend rights and liquidation preferences for the holders of Preferred Stock.

95.     As Fannie Mae and Freddie Mac's conservator, the FHFA also became obligated to act consistently with Fannie Mae and Freddie Mac's responsibilities under the Certificates.

96.     By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Class of any possibility of receiving dividends or a liquidation preference, the Companies, acting through the FHFA, breached the terms of the Certificates for the Preferred Stock.   The Third Amendment amends, alters, supplements or repeals the contractually-specified dividend rights and liquidation preferences of the holders of Preferred

Stock in a manner that materially affects the interests of the holders of Preferred Stock without the required consent of such holders of Preferred Stock.

97.     Plaintiffs and the other members of the Class suffered damages as a direct and proximate result of the forgoing breach of contact.

## COUNT II
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

### (Against Fannie Mae, Freddie Mac and the FHFA)

98.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

99.     Plaintiffs asserts this Count II in the alternative to Count I hereof, to the extent it is determined that no breach of contract occurred as alleged in Count I.

100.    The Certificates for Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Class and Fannie Mae and Freddie Mac.

101.    Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Fannie Mae and Freddie Mac to deal fairly with Plaintiffs and the other members of the Class, to fulfill its obligations to Plaintiffs and the Class in good faith, and not to deprive Plaintiffs and the Class of the fruits of their bargain.

102.    As Fannie Mae and Freddie Mac's Conservator, the FHFA also became obligated to act consistently with Fannie Mae and Freddie Mac's responsibilities under the implied covenant of good faith and fair dealing.

103.    By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae and Freddie Mac, acting through the FHFA, breached the

implied covenant of good faith and fair dealing inherent in the Certificates for the Preferred Stock. Through the implied covenant of good faith and fair dealing, Fannie Mae and Freddie Mac, acting through the FHFA, was obligated not to eliminate the rights and interests of the Class in receiving dividends or a liquidation preference. In effectively eliminating such rights and interests entirely through the Third Amendment, Fannie Mae and Freddie Mac, acting through the FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Class.

104.     Plaintiffs and the other members of the Class suffered damages as a direct and proximate result of the forgoing breach of contract.

**COUNT III**
**VIOLATION OF THE APA**
**TREASURY'S CONDUCT EXCEEDS ITS STATUTORY AUTHORITY**

105.     Plaintiffs and the members of the Class incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

106.     This claim is asserted on behalf of Plaintiffs and the Class against Treasury.

107.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

108.     HERA limits Treasury's authority to make financial investments in the Companies. For example, Treasury's authority under HERA to purchase the Companies' securities and to modify the terms and conditions of those securities expired on December 31, 2009. 12 U.S.C. §§ 1455(1)(4), 1719(g)(4).

109.     The Third Amendment, which was executed on August 17, 2012, created new securities, and Treasury's purchase of those securities violated that clearly demarcated limit on its authority.

39

110.     Under the original PSPAs, Treasury purchased equity interests that entitled it to Government Stock with certain characteristics: (i) a 10% quarterly dividend on an amount equal to the aggregate liquidation preference of the Government Stock; and (ii) a liquidation preference equal to the Companies' draws against Treasury's funding commitment.  These interests were embodied by stock certificates issued by the Companies, which were fixed income securities not otherwise entitling Treasury to participate in the earnings of the Companies.  The PSPAs also grant Treasury warrants to purchase up to 79.9% of the Companies' common stock at a nominal price.  The Third Amendment altered the underlying stock certificates to create a new security that entitles Treasury to a complete sweep of all of the Companies' net worth every quarter for as long as they remain in operation and that extinguishes all other equity rights.

111.     The Third Amendment thus effected a wholesale change to the nature of Treasury's securities after its statutory authority to purchase new securities had expired, and converted Treasury's Government Stock into new securities that nationalize the Companies and entitle Treasury to 100% of their net worth as if Treasury were the outright owner. Treasury cannot evade this clear statutory restriction on its authority to purchase securities of the Companies by simply calling these new securities an "amendment" to the old securities.

112.     Treasury also exceeded its authority by amending the PSPAs without making certain statutorily required findings or considering statutorily required factors.  Before exercising its temporary authority to purchase securities, HERA requires Treasury to "determine that such actions are necessary to . . . (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."   12 U.S.C. § 1719(g)(1)(B). In making the statutorily required determinations, HERA requires Treasury to consider such factors as "the [Companies'] plan[s] for the orderly resumption of private market

funding or capital market access" and "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]," among other factors. 12 U.S.C. § 1719(g)(1)(C).

113.   These statutory criteria must apply to any and all amendments of the PSPAs, in addition to the original execution of those agreements.  Otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors.  This would turn HERA's grant of temporary authority to Treasury to purchase the Companies' securities under certain conditions into an unconstrained, permanent authority.

114.   Based on the public record, Treasury has not made any of the required determinations or considered any of the necessary factors.  It therefore exceeded its statutory authority.

115.   Regardless, the Third Amendment is beyond Treasury's authority because it is not compatible with due consideration of the factors Treasury must consider before purchasing the Companies' securities or amending its agreements to purchase such securities.  The Third Amendment destroys value in all privately held securities in the Companies.  The Third Amendment is therefore wholly incompatible with "the need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]" and with the "orderly resumption of private market funding or capital market access."

116.   On information and belief, FHFA agreed to the Third Amendment only at the insistence and under the direction and supervision of Treasury.  But because HERA mandates that FHFA "shall not be subject to the direction or supervision of any other agency" when performing its duties as conservator for the Companies, 12 U.S.C. § 4617(a)(7), Treasury acted in excess of its authority in imposing its will on FHFA.

117.    Treasury's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiff and the Injunction Class are therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 706(2)(C), (D).

## COUNT IV
## VIOLATION OF THE APA
## TREASURY'S CONDUCT WAS ARBITRARY AND CAPRICIOUS

118.    Plaintiff and the members of the Class incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

119.    This claim is asserted on behalf of Plaintiff and the Class against Treasury.

120.    The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). This means, among other things, that agency action is unlawful unless it is the product of "reasoned decision making."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  Decision making that relies on inadequate evidence or that results in inconsistent or contradictory conclusions cannot satisfy that standard.

121.    Before Treasury exercises its temporary authority to purchase the Companies' securities, HERA requires Treasury to determine that the financial support is necessary to "provide stability to the financial markets," "prevent disruptions in the availability of mortgage finance," and "protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B)(i)-(iii), 1719(g)(1)(B)(i)-(iii). In making these determinations, HERA further requires Treasury to "take into consideration" several factors, including the "plan for the orderly resumption of private market funding or capital market access," and the "need to maintain [the] status [of Fannie and Freddie] as . . . private shareholder-owned compan[ies]." Id. at §§ 1455(l)(1)(C)(iii), (v), 1719(g)(1)(c)(iii), (v).

122.    These statutory criteria apply to any and all amendments of the PSPAs. Otherwise, Treasury could fundamentally alter its investments in the Companies at any time, including after its investment authority has expired, without making the required determinations or considering the necessary factors. This would turn HERA's grant of limited, temporary authority to Treasury, to purchase the Companies' securities under certain conditions, into an unconstrained and permanent authority.

123.    There is no evidence in the public record that Treasury made the required determinations or considered the necessary factors before agreeing to the Third Amendment. Indeed, the available record reveals that none of the necessary conditions was satisfied.  Thus, Treasury has failed to explain how its conduct is consistent with its statutory obligations. Indeed, the available evidence reveals that it was not.  Further, Treasury also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to private investors in the Companies, including refinancing the Government Stock or allowing the Companies to resume paying dividends to holders of their Preferred Stock and common stock. Treasury has thus arbitrarily and capriciously failed to provide a reasoned explanation for its conduct, which results in the Government's appropriation of tens of billions in private shareholder value.

124.    Treasury also acted in an arbitrary and capricious manner by failing to consider whether the Third Amendment is consistent with the fiduciary duties it owes as the Companies' dominant shareholder to holders of the Companies' Preferred Stock and common stock.

125.    Under Delaware law, which governs shareholders' relationship with Fannie Mae, and Virginia law, which governs shareholders' relationship with Freddie Mac, a corporation's dominant shareholder owes fiduciary duties to minority shareholders.

43

126.    Treasury is the dominant shareholder and de facto controlling entity of the Companies: Treasury is the Companies' only viable source of capital, and it must give its permission before the Companies issue debt or equity senior to the Government Stock.

127.    The Third Amendment effectively transfers the value of the Preferred Stock and common stock from their private holders to the Companies' dominant shareholder. And as Treasury admits, the Third Amendment's purpose is to wind down the Companies' operations. Treasury's actions in preventing any dividends or value from reaching holders of Preferred Stock and common stock, combined with Treasury's intent to liquidate the Companies, render the Preferred Stock and common stock devoid of any value or prospect of return.

128.    Treasury's conduct in entering into the Third Amendment was arbitrary and capricious, and Plaintiff and the members of the Class are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A).

## COUNT V
## VIOLATION OF THE APA
## FHFA'S CONDUCT EXCEEDS ITS STATUTORY AUTHORITY

129.    Plaintiffs and the members of the Class incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

130.    This claim is asserted on behalf of Plaintiffs and the Class against FHFA.

131.    The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations" or that are "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

132.    FHFA's authority as the Companies' Conservator is strictly limited by HERA. When acting as a conservator, HERA requires FHFA to take steps to put the Companies in "a sound and solvent condition" and to work to "conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D).

44

133.    FHFA, as the Companies' Conservator, is without authority to wind down the Companies' operations.    FHFA may only undertake such actions in its capacity as the Companies' receiver, but FHFA has declined to put the Companies into receivership.

134.    As Treasury has acknowledged, the Third Amendment is designed to wind down the Companies' operations.  The Third Amendment intentionally impairs the Companies' ability to operate as going concerns, requiring them to pay all of their net earnings to Treasury and thus preventing them from ever rebuilding capital, achieving financial health, or returning to private ownership.  In fact, the Third Amendment requires the Companies to accelerate the dissolution of their holdings.

135.    The Third Amendment is thus in direct contravention of HERA's statutory command that FHFA "conserve [their] property and assets" and undertake those actions "necessary to put the [Companies] in a sound and solvent condition" and "appropriate to carry on the business of the [Companies] and preserve and conserve [their] assets and property." 12 U.S.C. § 4617(b)(2)(D).  Indeed, instead of seeking to put the Companies in a "sound and solvent" condition and to preserve and conserve the Companies' assets and property, FHFA has expropriated the Companies' entire net worth for the benefit of the Government, to the detriment of the Companies and holders of Preferred Stock and common stock such as Plaintiff and the members of the Injunction Class.

136.    Further, under HERA, even when acting as a receiver, FHFA must wind down the Companies in accordance with specific claims determination procedures.  Among other things, HERA requires FHFA to "promptly publish a notice to the creditors of the regulated entity to present their claims," provide creditors with no fewer than ninety days in which to file a claim,

and "establish such alternative dispute resolution processes as may be appropriate for the resolution of claims." 12 U.S.C. §§ 4617(b)(3)(B)(i), (b)(7)(A).

137.     FHFA's decision, as a Conservator, to transfer all of the Companies' net worth to Treasury is an end-run around the procedural requirements HERA imposes on FHFA.  The Third Amendment allows Treasury to be paid amounts that exceed the value of its claims against the Companies, while making it impossible to satisfy claims of holders of the Companies' Preferred Stock and common stock. In short, the Third Amendment effectively nullifies the claims of holders of the Companies' Preferred Stock and common stock and precludes such holders from availing themselves of statutory protections to contest that nullification.

138.     FHFA's conduct in entering into the Third Amendment was therefore "in excess of statutory . . . authority" and "without observance of procedure required by law," and Plaintiffs and the members of the Injunction Class are therefore entitled to relief against Treasury pursuant to 5 U.S.C. §§ 706(2)(C), (D).

### COUNT VI
### VIOLATION OF THE APA
### FHFA'S CONDUCT WAS ARBITRARY AND CAPRICIOUS

139.     Plaintiffs and the members of the Class incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

140.     This claim is asserted on behalf of Plaintiffs and the Class against FHFA .

141.     The APA empowers the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency action is "arbitrary" or "capricious" if it is not the product of "reasoned decision making."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 52.  This means, among other things, that an agency must provide an adequate evidentiary basis

for its action, consider all important aspects of the problem before it, and rely upon consistent, logical reasoning in reaching its decision.

142.     In entering into the Third Amendment when both Companies were profitable and otherwise able to pay the 10% dividend on Treasury's Government Stock, FHFA acted in an arbitrary and capricious manner. There is no public record evidence that FHFA engaged in a reasoned decision-making process or considered important aspects of the problem it believed it faced. Nor did it establish an evidentiary basis nor provide an adequate explanation for its decision.  The FHFA could not have provided an adequate explanation for entering into the Third Amendment, for the Third Amendment is contrary to FHFA's responsibilities as Conservator of the Companies.

143.     FHFA has not offered any legitimate justification for the Third Amendment, which it has acknowledged prohibits the Companies from building capital and which Treasury has further acknowledged is designed to begin and expedite the dissolution of the Companies. FHFA has not explained how the Third Amendment is consistent with its statutory obligation to "conserve [the Companies'] assets and property" and to return the Companies to "a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D), or even whether it considered these factors. FHFA also has not explained whether it considered alternatives to the Third Amendment that would have been both consistent with its statutory obligations and less harmful to holders of the Companies' Preferred Stock and common stock, including refinancing the Government Stock or allowing the Companies to resume paying dividends to holders of their Preferred Stock and common stock.

144.     Plaintiff and the members of the Class, as holders of the Preferred Stock and common stock, invested substantial sums for the right to dividends and liquidation preferences

should market conditions make such payments possible.  By sweeping all of the Companies' net worth to Treasury in quarterly dividend payments, the Third Amendment makes it impossible for shareholders to realize the benefit of that bargain, no matter how well the Companies perform in the market or how much their assets may be worth in liquidation.  FHFA had an obligation to consider whether the Third Amendment was consistent with duties it owes to the Companies' shareholders. FHFA failed to do so.  FHFA therefore failed to consider an important aspect of the issue addressed by its action, rendering the Third Amendment arbitrary and capricious.

145.    FHFA's conduct in entering into the Third Amendment was arbitrary and capricious, and Plaintiff and the members of the Injunction Class are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(C).

## COUNT VII
## BREACH OF FIDUCIARY DUTY

### (Against the Treasury and the FHFA)

146.    Plaintiffs incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    By imposing a conservatorship over Fannie Mae and Freddie Mac, through which the FHFA assumed the powers of its officers and directors, the FHFA assumed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and Freddie Mac and its stockholders, including Plaintiffs and the other members of the Class, and were and are required to use their utmost ability to control and manage Fannie Mae and Freddie Mac in a fair, just, honest, and equitable manner.  The FHFA was and is required to act in furtherance of the best interests of Fannie Mae and Freddie Mac and its shareholders so as to benefit all shareholders equally and not in furtherance of the personal interest or benefit of the FHFA, the Treasury, or the federal government.

148.    The Treasury exercises *de facto* control over Fannie Mae and Freddie Mac, including through its Senior Preferred Stock and warrants to purchase Fannie Mae and Freddie Mac common stock, as well as its control of the provision of funds to Fannie Mae and Freddie Mac.  As controlling stockholder of Fannie Mae and Freddie Mac, the Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and Freddie Mac and its other stockholders.

149.    The Third Amendment constituted a self-dealing transaction.  The Treasury, as controlling stockholder of Fannie Mae and Freddie Mac, stood on both sides of the decision to implement the Third Amendment, to the benefit of the Treasury and the detriment of Fannie Mae and Freddie Mac and its stockholders other than the Treasury.  Moreover, as an agency of the federal government, the FHFA was interested in and benefited from the Third Amendment.

150.    Through the Third Amendment, the FHFA and the Treasury breached their fiduciary duties to Fannie Mae and Freddie Mac.  The Third Amendment was not entirely fair to Fannie Mae and Freddie Mac, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Third Amendment, which effectively delivers all of Fannie Mae and Freddie Mac's profits to the Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae and Freddie Mac in return.

151.    The Third Amendment was neither entirely nor intrinsically fair, nor did it further any valid business purpose of Fannie Mae and Freddie Mac, nor did it reflect a good faith business judgment as to what was in the best interests of Fannie Mae and Freddie Mac or its shareholders.

152.    The Third Amendment constituted waste and a gross abuse of discretion.

153.     As a direct and proximate result of the foregoing breach of fiduciary duty, Fannie

Mae and Freddie Mac suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

1. Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2. Awarding Plaintiffs and the Class the amount of damages they sustained as a result of defendants' breaches of contract and breaches of the implied covenant of good faith and fair dealing;

3. Granting appropriate equitable and injunctive relief to remedy defendants' breaches of contract, breaches of the implied covenant of good faith and fair dealing, and violations of the APA, including rescission of the Third Amendment;

4. Declaring that the Third Amendment was neither entirely nor intrinsically fair to Fannie Mae and Freddie Mac, did not further any valid business purpose of Fannie Mae and Freddie Mac, did not reflect a good faith business judgment as to what was in the best interests of Fannie Mae and Freddie Mac or its shareholders, and constituted waste and a gross abuse of discretion.

5. Declaring that the Third Amendment, and its adoption, are not in accordance with HERA within the meaning of 5 U.S.C. § 706(2)(C); and that Treasury and FHFA acted arbitrarily and capriciously within the meaning of 5 U.S.C. § 706(2)(A) by executing the Third Amendment;

6. Declaring that, through the Third Amendment, defendants the FHFA and the Treasury breached their respective fiduciary duties to Fannie Mae and Freddie Mac;

7. Awarding compensatory damages and disgorgement in favor of Fannie Mae and Freddie Mac against defendants the FHFA and the Treasury, jointly and severally, as a result of such defendants' breach of their respective fiduciary duties, in an amount to be proven at trial, including interest thereon;

8. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

9. Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 18, 2013

Respectfully Submitted,

**GRANT & EISENHOFER P.A.**

/s/ Geoffrey C. Jarvis
Geoffrey C. Jarvis
123 Justison Street
Wilmington, DE  19801
Telephone:  (302) 622-7000
Facsimile:  (302) 622-7100
gjarvis@gelaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiffs*